**[ORAL ARGUMENT SCHEDULED FOR DECEMBER 14, 2020]**

**Case No. 20-5302**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

TikTok Inc. et al.,

*Plaintiffs-Appellees,*

v.

Donald J. Trump, in his official capacity as President of the
United States et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR APPELLEES**

John E. Hall
Anders Linderot
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000

Beth S. Brinkmann
Alexander A. Berengaut
Megan A. Crowley
Megan C. Keenan
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

November 6, 2020

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for TikTok Inc. and ByteDance Ltd. (collectively, "Plaintiffs-Appellees") hereby certifies as follows:

**(A)     Parties and Amici.**  TikTok Inc. and ByteDance Ltd. were the plaintiffs in the district court.  TikTok Inc. and ByteDance Ltd. are the appellees in Case No. 20-5302.  The appellants in Case No. 20-5302 are Donald J. Trump, in his official capacity as President of the United States; Wilbur Ross, in his official capacity as Secretary of Commerce; and the United States Department of Commerce.  They were the defendants before the district court.

There were no amici who had been granted leave to file at the time of the district court's decision that is subject of this appeal.

**(B)     Ruling Under Review.**  The ruling under review is the memorandum opinion and order issued by the Honorable Carl J. Nichols of the United States District Court for the District of Columbia in Case No. 1:20-cv-2658 on September 27, 2020, granting plaintiffs a preliminary injunction.  *TikTok et al. v. Trump et al.*, No. 20-cv-2658 (D.D.C. Sept. 27, 2020) (JA 764–83).  The ruling has not yet been

i

published in the Federal Supplement, but is available at 2020 WL 5763634.

**(C)**    **Related Cases.**  This case has not previously been before this Court or any court other than the U.S. District Court for the District of Columbia.

Respectfully submitted,

*/s/ Beth S. Brinkmann*
Beth S. Brinkmann
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-6000
Email: bbrinkmann@cov.com

*Attorney for Plaintiffs-Appellees*

## Table of Contents

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT .......................................................... 3

PERTINENT STATUTE AND REGULATIONS ..................................... 4

ISSUE PRESENTED ................................................................................ 4

STATEMENT OF THE CASE .................................................................. 4

I.    Statutory Framework ...................................................................... 4

II.   Factual Background ......................................................................... 7

     A.    The President Invoked IEEPA To Issue An August 6, 2020 Order To Ban TikTok. ..................................................... 7

     B.    The Commerce Department Issued A List of Prohibitions To Implement The Order .................................. 10

III.  Proceedings Below ......................................................................... 11

STANDARD OF REVIEW ...................................................................... 16

SUMMARY OF ARGUMENT ................................................................ 16

ARGUMENT ............................................................................................ 23

THE GOVERNMENT HAS FAILED TO DEMONSTRATE THAT THE PRELIMINARY INJUNCTION SHOULD BE VACATED .......................................................................................... 23

I.    Plaintiffs Are Likely To Succeed On The Merits Because The Commerce Department Prohibition Exceeds The Authority Granted By IEEPA. ....................................................................... 23

     A.    The Prohibition Violates The Explicit Textual Limits Of Section 1702(b)(3) By, At A Minimum, Regulating Indirectly "Information or Informational Materials." .......... 24

B.  The Prohibition Violates The Explicit Textual Limits Of Section 1702(b)(1) By, At A Minimum, Regulating Indirectly "Personal Communication." ................................. 42

C.  The Government's Reading Of Sections 1702(b)(3) And (b)(1) Would Raise Serious Constitutional Questions That Should Be Avoided. ...................................... 47

D.  The Government's Reading Of Sections 1702(b)(3) And (b)(1) Cannot Be Reconciled With The Statutory Structure ................................................................. 49

E.  The Government's Interpretation Of Sections 1702(b)(3) and (b)(1) Is Belied By The Statutory Background And Purpose. ........................................................... 52

II.  The Other Relevant Factors Support The Preliminary Injunction ................................................................. 59

A.  Absent A Preliminary Injunction, Plaintiffs Would Suffer Irreparable Harm ...................................... 59

B.  The District Court Appropriately Balanced The Equities And Public Interest. ........................................... 64

CONCLUSION ................................................................. 68

# TABLE OF AUTHORITIES

**Cases:**                                                                   **Page(s)**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ................................................................ 27

*Ass'n of Priv. Sector Colls. v. Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) ............................................. 28

*Atlas Air, Inc. v. Int'l Brotherhood of Teamsters,*
    928 F.3d 1102 (D.C. Cir. 2019) ........................................... 63

*Cernuda v. Heavey,*
    720 F. Supp. 1544 (S.D. Fla. 1989)..................................... 53

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ............................................................. 42

*Clark v. Martinez,*
    543 U.S. 371 (2005) ............................................................. 47

*D.C. Hosp. Ass'n. v. District of Columbia,*
    224 F.3d 776 (D.C. Cir. 2000) ............................................. 50

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................. 34

*Feinerman v. Bernardi,*
    558 F. Supp. 2d 36 (D.D.C. 2008) ....................................... 63

*Gomez v. United States,*
    490 U.S. 858 (1989) ............................................................. 48

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ............................................. 65

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) ................................................ 52

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................................ 68

*Hooper v. People*,
    155 U.S. 648 (1895) ..................................................... 48

*Kalantari v. NITV*,
    352 F.3d 1202 (9th Cir. 2003) ............................. 28, 29, 32, 33, 53, 54

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ....................................... 64, 66

*Local Union v. J.A. Jones Constr.*,
    846 F.2d 1213 (9th Cir. 1988) ........................................ 35

*Marland v. Trump*,
    2020 WL 6381397 (E.D. Pa. Oct. 30, 2020) ................ 30, 31, 41, 52, 58

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) .................................... 16

*Oregon Waste Sys. v. Dep't of Env't Quality*,
    511 U.S. 93 (1994) ...................................................... 32

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) .................................................... 46

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .................................... 64, 65

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
    136 S. Ct. 1938 (2016) ................................................. 24

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ............................... 65, 66

*Reno v. Am. Civ. Liberties Union*,
    521 U.S. 844 (1997) .................................................... 42

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004) .................................................... 57

*Robertson v. Cartinhour*,
   429 F. App'x 1 (D.C. Cir. 2011) ............................................................ 64

*Sandifer v. U.S. Steel Corp.*,
   571 U.S. 220 (2014) ........................................................................ 24

*Smoking Everywhere, Inc. v. FDA*,
   680 F. Supp. 2d 62 (D.D.C. 2010) ........................................................ 63

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ........................................................................ 50

*U.S. WeChat Users v. Trump*,
   2020 WL 5592848 (N.D. Cal. Sept. 19, 2020) .................................... 48

*U.S. WeChat Users v. Trump*,
   2020 WL 6271054 (N.D. Cal. Oct. 23, 2020) ...................................... 48

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011) ...................................................... 6, 28, 54

*United States v. Gonzales*,
   520 U.S. 1 (1997) ........................................................................ 27

*United States v. Menasche*,
   348 U.S. 528 (1955) ...................................................................... 29

*United States v. Robel*,
   389 U.S. 258 (1967) ...................................................................... 67

*Walsh v. Brady*,
   927 F.2d 1229 (D.C. Cir. 1991) ........................................................ 31

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) .................................................................. 45

*Wisconsin Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................ 60

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................. 55, 56

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) ............................................................... 57


**Statutes:**

5 U.S.C. § 551. .................................................................................. 3

5 U.S.C. § 702(2)(A) ........................................................................ 12

28 U.S.C. § 1292(a)(1) ....................................................................... 4

28 U.S.C. § 1331 ................................................................................ 3

47 U.S.C. § 214 ................................................................................ 58

50 U.S.C. § 1701(a) .................................................................. 4, 5, 34

50 U.S.C. § 1702(b) .............. 5, 6, 12–21, 24–29, 32–38, 40–50, 52, 54–58

50 U.S.C. § 1708 ..................................................................... 21, 51, 52

50 U.S.C. § 4305 .............................................................................. 31

50 U.S.C. § 4565 .............................................................................. 58

Pub. L. No. 95-223, title II, § 203(b), 91 Stat. 1626 (1977) ...................... 5

Pub. L. No. 100-418, title II, § 2502(b)(1), 102 Stat. 1371
  (1988) ............................................................................... 6, 53

Pub. L. No. 103-236, title V, § 525(c)(1), 108 Stat. 474 (1994) ................. 6

Carl Levin and Howard P. "Buck" McKeon National Defense
  Authorization Act for Fiscal Year 2015, Pub. L. No. 113-
  291, § 1637, 128 Stat. 3292 (2014) ...................................... 51


**Regulations and Executive Actions:**

31 C.F.R. § 515.542 .......................................................................... 39

31 C.F.R. § 560.210(c)(1) .................................................................. 40

54 Fed. Reg. 5229 (Feb. 2, 1989) ........................................................ 54

Executive Order 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019) ..................................................... 8

*Continuation of the National Emergency With Respect to Securing the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 29321 (May 13, 2020) .............................................................. 8

**Legislative Materials:**

H.R. Conf. Rep. No. 95-459 (1977) .................................................... 46, 53

H.R. Conf. Rep. No. 103-482 (1994) ...................................... 28, 32, 33, 54

H.R. Rep. No. 100-40 (1987) ................................................................. 53

**Other Authorities:**

Oxford English Dictionary (Sept. 2003), www.oed.com/view/Entry/255044 ....................................................... 26

## GLOSSARY

CFIUS      Committee on Foreign Investment in the United States

IEEPA     International Emergency Economic Powers Act

OFAC      Office of Foreign Assets Control

**INTRODUCTION**

Congress specified in the International Emergency Economic Powers Act ("IEEPA") that the otherwise broad authority it granted to the President under that statute "does not include the authority to regulate or prohibit, directly or indirectly," the importation or exportation, "whether commercial or otherwise," "of any information or informational materials." 50 U.S.C. § 1702(b)(3).

Congress further specified that the President's IEEPA authority "does not include the authority to regulate or prohibit, directly or indirectly," "any … personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1).

The Commerce Department, however, issued a series of Prohibitions pursuant to a presidential order issued under IEEPA that violates both of those statutory limitations.

The district court's preliminary injunction against the first Commerce Prohibition is at issue here. That first Prohibition effectively bans TikTok—an online communications platform used by more than 100 million Americans—from U.S. mobile application ("app") stores, such as the Apple App Store and the Google Play Store. If allowed to go into

effect, it would prevent everyone in the United States from downloading the app and the 100 million existing TikTok users from downloading updates to keep their user data secure.

The Prohibition violates Section 1702(b)(3) by, at a minimum, indirectly regulating the flow of information and informational materials on the app. It also violates Section 1702(b)(1) by, at a minimum, indirectly regulating personal communications shared on the app. The Commerce Department, itself, explained that the "objective" of its Prohibition is to stop transmission of data over the app, thereby halting the exchange of information, informational materials, and personal communications. 2JA332.

For these reasons, the district court correctly concluded that Plaintiffs are likely to succeed on the merits. *See* 3JA779. The court also correctly found that Plaintiffs would suffer irreparable harm absent a preliminary injunction, and that the other relevant factors all warranted a preliminary injunction against the Prohibition.

The government now asks the Court to vacate the preliminary injunction based on its remarkable position that the Prohibition, which indisputably denies all new U.S. users the ability to engage in personal

communication or convey information and informational materials on TikTok, does not "indirectly regulate users' activity on TikTok" and does "not regulate informational materials at all." Br. at 64. That argument is contrary to the plain text of Sections 1702(b)(3) and (b)(1), as well as IEEPA's structure, background, and purpose. The Prohibition self-evidently prohibits the sharing of information, informational materials, and personal communications on the app, and exceeds the government's IEEPA authority.

## JURISDICTIONAL STATEMENT

This action, filed by Plaintiffs-Appellees TikTok Inc. and its indirect parent company ByteDance Ltd., against Defendants-Appellants Donald J. Trump, in his official capacity as President of the United States; Wilbur Ross, in his official capacity as Secretary of Commerce; and the U.S. Department of Commerce, arose under the Constitution and laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The district court entered the preliminary injunction on September 27, 2020, 3JA766–83, and Defendants filed a timely notice of

appeal on October 8, 2020, 3JA787–88.  This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes and regulations are set forth in Addendum A to this brief.

## ISSUE PRESENTED

Whether the preliminary injunction against the Commerce Department's Prohibition that would ban TikTok from app stores in the United States, based on Plaintiffs' likelihood of succeeding because the Prohibition violates IEEPA, and based on the district court's consideration of irreparable harm, the equities, and the public interest, should be vacated.

## STATEMENT OF THE CASE

### I.    Statutory Framework

Congress enacted IEEPA in 1977 to confer on the President certain powers to respond to any "unusual and extraordinary" threat to the national security, foreign policy, or economy of the United States that "has its source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a).  Congress imposed various limitations on this

authority. As a threshold matter, the President must declare a national emergency with respect to the threat. 50 U.S.C. § 1701(a).

Congress provided that, if the President declares a national emergency, he can exercise authority to deal with that threat by regulating transactions "by any person, or with respect to any property … subject to the jurisdiction of the United States" that "involv[e] … property in which any foreign country or a foreign national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Congress expressly limited that authority from the outset, however, specifying that "[t]he authority granted to the President" under Section 1702 "does not include the authority to regulate or prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1); Pub. L. No. 95-223, title II, § 203(b), 91 Stat. 1626 (1977). This personal communication limitation on the government's regulatory authority in Section 1702(b)(1) has not changed since the statute was enacted in 1977.

Congress added the other limitation relevant here, Section 1702(b)(3), in 1988 through the "Berman Amendment." That amendment expanded the matters over which the executive lacks regulatory

authority under IEEPA, specifying that the President's IEEPA authority "does not include the authority to regulate or prohibit, directly or indirectly," the importation or exportation, "whether commercial or otherwise," of "publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes or other informational materials." 50 U.S.C. § 1702(b)(3); Pub. L. No. 100-418, title II, § 2502(b)(1), 102 Stat. 1371 (1988).

In 1994, Congress expanded the informational materials "limitation on executive authority" by enacting the Free Trade in Ideas Act. *United States v. Amirnazmi*, 645 F.3d 564, 585 (3d Cir. 2011). Congress replaced the above-quoted language of Section 1702(b)(3) with a broader provision that specifies that IEEPA's limitation against regulation of informational materials applies "regardless of format or medium of transmission" to "any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. § 1702(b)(3); Pub. L. No. 103-236, title V, § 525(c)(1), 108 Stat. 474 (1994).

6

## II.    Factual Background

### A.    The President Invoked IEEPA To Issue An August 6, 2020 Order To Ban TikTok.

On August 6, 2020, the President invoked IEEPA to issue an order entitled "Addressing the Threat Posed by TikTok."  1JA195.

TikTok is an app that provides an online communication platform for users to create and share short-form videos.  *See* 1JA65.  TikTok is operated in the United States by Plaintiff TikTok Inc., an American company incorporated and headquartered in California with a U.S.-based management team, and its indirect parent company, Plaintiff ByteDance Ltd. ("ByteDance"), which is incorporated in the Cayman Islands and through its subsidiaries has offices in the United States, China, and elsewhere.  Since its global launch in September 2017, TikTok has grown significantly, and today, based on quarterly usage, more than 100 million Americans use TikTok, and, on average, 424,000 new U.S. users join each day.  1JA65–66, 68.  TikTok is not and never has been offered in China, 1JA58, and TikTok was designed to be completely separate from ByteDance's China-facing apps, 1JA58–59.

The August 6 order asserted, without evidentiary support, that ByteDance's ownership of TikTok could allow the Chinese government to

access and misuse U.S. user data, and that the Chinese government might censor or use TikTok messages for propaganda purposes. The order prohibited "any transaction," by "any person, or with respect to any property, subject to the jurisdiction of the United States," with "ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries," in which "any such company has any interest, as identified by the Secretary of Commerce." 1JA197. It directed the Secretary of Commerce to "identify the transactions subject to" the ban within 45 days and declared that the transactions would be prohibited "beginning 45 days after" the August 6 order, *i.e.*, September 20, 2020. 1JA196–97.

The order was issued without notice to Plaintiffs, on the heels of anti-TikTok statements by the Administration and the President's re-election campaign. *See, e.g.*, 1JA179, 1JA182, 1JA190, 1JA192.[1]

The order did not reflect any of the considerations or mitigation strategies from the year-long inquiry by the Committee on Foreign

---

[1]  The August 6 order purported to rely on the national emergency declared in Executive Order 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019). *See also Continuation of the National Emergency With Respect to Securing the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 29321 (May 13, 2020).

Investment in the United States ("CFIUS") related to ByteDance's 2017 acquisition of the U.S. assets of Musical.ly, a China-based video-sharing application, in which CFIUS also obtained information about TikTok. Notwithstanding various legal shortcomings in CFIUS's inquiry, from October 2019 through August 2020, Plaintiffs provided to CFIUS voluminous documentation and a number of mitigation strategies that would allow the U.S. government to mitigate any concern it had about national security risk around TikTok's user data. *See* 1JA82–83.[2]

Approximately one month after the August 6 order, the Commerce Department issued an administrative subpoena to Plaintiffs on September 3 for certain information about their data centers, domain

---

[2] On August 14, 2020, the President issued a separate order, invoking CFIUS, entitled "Regarding the Acquisition of Musical.ly by ByteDance Ltd.," which purports to order ByteDance to divest the U.S. TikTok business. 1JA204 ("CFIUS order"). In contrast to the ban of the app from the United States that was declared necessary by the August 6 order, the premise of the CFIUS order is that divestment of the business would address the President's purported national security concerns. On September 19, 2020, the President explicitly stated that he had given his "blessing" and "approve[d] … in concept," 1JA259, a mitigation solution whereby (1) Oracle would host all TikTok U.S. user data and secure associated computer systems to ensure that U.S. national security requirements are satisfied, (2) TikTok would enter a commercial partnership with Walmart, and (3) Oracle and Walmart would acquire up to a 20 percent stake in TikTok Global, 1JA262.

names, business partners, content moderation and data collection practices, and other topics. 1JA231–33. The Commerce Department provided no national security or factual findings, and no opportunity to respond to any findings or proposed prohibitions.

B.    The Commerce Department Issued A List of Prohibitions To Implement The Order.

Two weeks after the administrative subpoena, the Commerce Department on September 18, 2020, issued a list of Prohibitions, without giving Plaintiffs notice or an opportunity to respond, to implement the August 6 order. 1JA247.

The first Prohibition would have required the removal of TikTok from U.S. app stores by September 20, 2020. It prohibits "[a]ny provision of services … to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store" available to individuals in the United States. 1JA252. The Prohibition would prevent any prospective TikTok U.S. users from downloading the app, and all existing U.S. users from receiving updates to the app, including those needed to keep their data secure. *Id.* The

other four Prohibitions listed by the Commerce Department would shut down TikTok in the United States entirely on November 12.[3]

The Department of Commerce almost immediately postponed the September 20 effective date of the first Prohibition.  It withdrew its September 18 notice, and then issued a new notice on September 22, which postponed the effective date for the first Prohibition until September 27, but kept November 12 as the effective date of the other Prohibitions.  1JA277.

## III.  Proceedings Below

Plaintiffs filed this action on September 18, 2020, 1JA1, and filed their motion to preliminarily enjoin the Prohibitions on September 23. 3JA767.

Plaintiffs sought a preliminary injunction based on their likelihood of succeeding on the merits because the Prohibitions are unlawful on the following grounds: (1) they exceed the explicit IEEPA

---

[3] The Commerce Department notice also purports to prohibit "[a]ny other transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd., or its subsidiaries, including TikTok Inc., in which any such company has any interest, as may be identified at a future date under the authority delegated under Executive Order 13942."  1JA283.

limitation in 50 U.S.C. §1702(b)(3) against the prohibition or regulation, directly or indirectly, of the import or export of "any information or informational materials"; (2) they exceed the explicit IEEPA limitation in 50 U.S.C. § 1702(b)(1) against the prohibition or regulation, directly or indirectly, of "personal communication"; (3) they violate the Fifth Amendment by prohibiting TikTok from operating in the United States without providing Plaintiffs notice or an opportunity to be heard; (4) they restrict Plaintiffs' speech in violation of the First Amendment; (5) they are arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 702(2)(A); (6) they constitute an unlawful taking in violation of the Fifth Amendment; and (7) they otherwise exceed Defendants' authority under IEEPA.

The district court on September 27, 2020, entered a preliminary injunction against the first Prohibition, which was the only Prohibition set to go into effect that day. The court ruled that Plaintiffs are likely to succeed on the merits because the Prohibitions violate IEEPA by, at a minimum, indirectly regulating the exchange of "information or informational materials" in violation of Section 1702(b)(3), and "personal communication" in violation of Section 1702(b)(1). 3JA779.

The district court found that "[t]he content exchanged by TikTok users constitutes 'information and informational materials'; indeed, much of that content appears to be (or to be analogous to) 'publications, films, … photographs, … artworks, … and news wire feeds,'" which are explicitly listed in Section 1702(b)(3).  3JA775.  The court also found that "the purpose and effect of the Secretary's prohibitions is to limit, and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok," and concluded that the Prohibitions "will have the intended effect of stopping U.S. users from communicating (and thus sharing data) on TikTok."  3JA775–76, 79.  The court rejected the government's arguments that the Prohibitions fall outside Section 1702(b)(3) because they purportedly regulate business-to-business transactions or "mediums of transmission," because these arguments are contrary to the plain text of the statute.  Accordingly, the court concluded that Plaintiffs are likely to succeed on their claim that the Prohibitions indirectly regulate informational materials in violation of Section 1702(b)(3).

The court reached a similar conclusion regarding Section 1702(b)(1). The court found that "[i]t is undisputed that the Secretary's prohibitions will have the effect of preventing Americans from sharing personal communications on TikTok." 3JA778. The court rejected the government's argument that Plaintiffs are not likely to succeed because some communications on TikTok "have economic value," and therefore are not included under Section 1702(b)(1). The court concluded that "such an expansive reading of the phrase 'anything of value' would write the personal-communications limitation out of the statue." 3JA778–79. The court also found that "a wide swath of TikTok videos, public comments … , and private messages between friends about TikTok videos are personal communications with no economic value at all." 3JA778 (citation omitted). The court also rejected the government's argument that Plaintiffs' reading of the statute would lead to an "IEEPA-free zone that Congress could not have intended," concluding that this argument "does not find support in the text of the statute." 3JA777. Accordingly, the court concluded that Plaintiffs are likely to succeed on their claim that the Prohibitions indirectly regulate personal communication in violation of Section 1702(b)(1).

The court then addressed the other requirements for preliminary injunctive relief. The court found that "[t]he Secretary's prohibitions, including the prohibition scheduled to take effect tonight, will inflict irreparable economic and reputational harm on Plaintiffs," and the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." 3JA781–82 (citation omitted). Weighing the equities and the public interest, the court concluded that the public interest would not be served by the enforcement of the illegal Prohibition, and although "the government has provided ample evidence that *China* presents a significant national security threat, … the specific evidence of the threat posed *by Plaintiffs*, as well as whether the prohibitions are the only effective way to address that threat, remains less substantial." 3JA782 (emphasis added).

Because the court found that Plaintiffs had demonstrated a likelihood of success on their IEEPA claims, it "[did] not analyze Plaintiffs' other statutory and constitutional claims to decide whether Plaintiffs are entitled to preliminary relief." 3JA779 n.3. The court observed, however, "that Plaintiffs appear to have presented at least serious questions on their other claims." *Id.* A renewed motion for a

preliminary injunction with respect to the remaining Commerce Department Prohibitions is pending in the district court.

## STANDARD OF REVIEW

This Court "review[s] a district court decision regarding a preliminary injunction for abuse of discretion, and any underlying legal conclusions *de novo*." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009) (citation omitted). The Court "will overturn any of the district court's factual findings only upon a finding of clear error." *Id.*

## SUMMARY OF ARGUMENT

Congress specifically limited the regulatory authority it granted the executive under IEEPA to not include any authority to "regulate or prohibit, directly or indirectly," "information or informational materials," 50 U.S.C. § 1702(b)(3), or "personal communication," 50 U.S.C. § 1702(b)(1). The Commerce Department's Prohibition violates those limitations. The Prohibition will "have the intended effect of stopping U.S. users from communicating (and thus sharing data) on TikTok," and therefore constitutes, at a minimum, the indirect regulation of information, informational materials, and personal communication in violation of Sections 1702(b)(3) and (b)(1). *See* 3JA779; 2JA332. Because the district court correctly concluded that Plaintiffs are likely to succeed

16

on the merits and otherwise established the elements for injunctive relief, the preliminary injunction against the Prohibition should be affirmed.

I. A.   Congress spoke clearly in Section 1702(b)(3) when it provided that the President's IEEPA authority "does not include the authority to regulate or prohibit, directly or indirectly," the importation or exportation of "information or informational materials," and when it provided that this limitation applies to such matters, "commercial or otherwise, regardless of format or medium of transmission."  50 U.S.C. § 1702(b)(3).  The government does not dispute that the materials shared on TikTok constitute information or informational materials.  Nor does it argue that these materials are not imported and exported.  Instead, it makes a series of arguments that conflict with the plain language of the statute.  *See* 3JA777.

Defendants are wrong that the Prohibition is lawful because it regulates TikTok's "commercial" transactions.   Br. at 31.   Section 1702(b)(3) plainly applies to information or informational materials, "whether commercial or otherwise."   50 U.S.C. § 1702(b)(3); *see also* 3JA775.  And Defendants are wrong that the Prohibition is lawful based

17

on their view that it has only an "incidental effect" on the transmission of information.  Br. at 31.  The Prohibition has much more than an incidental effect on the transmission of information and, in any event, Section 1702(b)(3) does not allow even indirect regulation of such materials.  Courts have widely recognized—including when interpreting Section 1702(b)(3)—that governmental action with even an "incidental effect" may still constitute "indirect regulation."

Defendants' attempt to read an intent requirement into Section 1702(b) is meritless.  Such a novel (and atextual) interpretation would allow the government to evade Section 1702(b)(3)'s limitations by reciting any permissible "aim" for its conduct.  Moreover, as the district court found, "*the purpose* and effect" of the Prohibition, 3JA775 (emphasis added), is, in fact, to eliminate the sharing of informational materials on TikTok as a means to counter purported data collection and disinformation concerns.

The government also wrongly contends that the Prohibition is lawful because it regulates TikTok as a "medium of transmission."  Br. at 23.  To the contrary, the text of Section 1702(b)(3) states that it prohibits regulation of informational materials "regardless of format or

medium of transmission." And Section 1702(b)(3) includes, in its nonexclusive list of protected information and informational materials, "publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," several of which could be described as a medium of transmission.

B.    Congress also spoke directly in Section 1702(b)(1) when it provided that the President's IEEPA authority "does not include the authority to regulate or prohibit, directly or indirectly," "personal communication." 50 U.S.C. § 1702(b)(1). And the government does not dispute that millions of personal communications are shared on TikTok every day.

The government nonetheless contends that these personal communications are not protected by Section 1702(b)(1) because they "involve a transfer of [something] of value." Br. at 22. But as the district court correctly found, "a wide swath" of the "videos, public comments …, and private messages" exchanged on TikTok are personal communications "with no economic value at all." 3JA778 (citation omitted). The fact that users sending personal communications over the

app may benefit TikTok as a platform by granting a license to the shared material or transferring data as a byproduct of communication, does not alter that analysis.  When a person sending a personal communication grants a communications provider access to data or makes a payment in exchange for use of its service—whether that be a license to information, a monthly payment for telephone usage, or a stamp to send a letter—that does not mean that the personal communication *itself* "involve[s] a transfer of [something] of value."  50 U.S.C. § 1702(b)(1).  Otherwise, any payment made to a postal, telegraph, or telephone company would place the personal communication outside the reach of Section 1702(b)(1)—an absurd outcome that the plain language of the statute does not permit.

C.    The government's interpretation of the statute not only conflicts with the plain language of both Sections 1702(b)(3) and (b)(1), it also raises a host of First Amendment concerns.  The doctrine of construing statutes to avoid doubt about their constitutionality therefore requires rejection of the government's reading.

D.    IEEPA's statutory structure also refutes the government's reading of Sections 1702(b)(3) and (b)(1).  In Section 1702(b)(2), the provision between (b)(1) and (b)(3), Congress included another limitation

on IEEPA authority, this one involving humanitarian donations. Section 1702(b)(2) includes three explicit exceptions to this limitation. The first exception applies when the President determines that the donations "would seriously impair his ability to deal with any national emergency." 50 U.S.C. § 1702(b)(2)(A). Congress included no such exception in Section 1702(b)(3) or (b)(1). There is no basis for the Court to create one.

The government invokes 50 U.S.C. § 1708, but that statute is not part of IEEPA, addresses a different issue, and has a different scope and structure. It authorizes the President to sanction cybercriminals who "knowingly" engage in theft of "trade secrets or proprietary information" through deployment of malicious computer code or the like, not the sharing of information or personal communication protected by Sections 1702(b)(3) and (b)(1). Indeed, Section 1708(c) expressly states that "[n]othing in this section shall be construed to affect the … exercise of any authority provided for under any other provision of law." 50 U.S.C. § 1708(c).

E.    The government's reading of Sections 1702(b)(3) and (b)(1) also is belied by the statutory background and purpose. Section 1702(b)(1) was enacted in 1977 to limit the President's IEEPA authority

to prohibit or regulate personal communication. Congress expanded Section 1702(b)'s limitations to protect the import and export of informational materials not once, but twice, in 1988 and 1994.

The government's reference to Congress's constitutional authority to vest the executive with broad national security power deflects from the statutory text that governs this case. The Court is not being asked to second-guess a national security determination, but rather to construe a statute, which is a question squarely in the Court's authority and responsibility to resolve.

II.    The district court correctly concluded that the remaining factors support entry of the preliminary injunction. Absent an injunction, the Prohibition would inflict irreparable economic and reputational harm on Plaintiffs, destroying their U.S. business. It would decimate TikTok's user base and competitive position, destroy the goodwill necessary for Plaintiffs to maintain commercial partnerships in the United States, and cripple their ability to attract and retain talent.

The government does not suffer harm from an injunction that stops its unlawful action. And the public interest is served by an injunction

against the Prohibition's restriction that otherwise would violate the First Amendment rights of millions of new American TikTok users to engage in protected speech and personal communication on the TikTok app. Moreover, if the injunction were vacated, more than 100 million Americans who already use the app would be unable to download updates, including those needed to keep their data secure, undermining the very security risks the Prohibitions were purportedly issued to address.

## ARGUMENT

## THE GOVERNMENT HAS FAILED TO DEMONSTRATE THAT THE PRELIMINARY INJUNCTION SHOULD BE VACATED

This Court should affirm the preliminary injunction. Plaintiffs are likely to succeed on their claim that the enjoined Prohibition exceeds the executive branch's authority under IEEPA, and the other factors amply support the preliminary injunction. The government has failed to demonstrate to the contrary.

## I.   Plaintiffs Are Likely To Succeed On The Merits Because The Commerce Department Prohibition Exceeds The Authority Granted By IEEPA.

The Commerce Department's Prohibition violates IEEPA because, at a minimum, it regulates indirectly the exchange of "information or

informational materials" and "personal communication[s]." 50 U.S.C. §§ 1702(b)(3), (b)(1). The government's attempt to rewrite the statute to reach a different result is contrary to the statutory text, structure, background, and purpose and should be rejected.

A. The Prohibition Violates The Explicit Textual Limits Of Section 1702(b)(3) By, At A Minimum, Regulating Indirectly "Information or Informational Materials."

Statutory interpretation "begins with the language of the statute," and where the statute's language is plain, "that is also where the inquiry should end." *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (quotation omitted). "It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time the statute was enacted. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quotation omitted).

1. Section 1702(b)(3) provides, in relevant part, that the President's IEEPA authority "does not include the authority to regulate or prohibit, directly or indirectly," the importation or exportation, "commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials." 50 U.S.C. § 1702(b)(3).

24

Section 1702(b)(3) then sets forth a non-exhaustive list of such protected information and informational materials: "including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." *Id.*

The material shared on TikTok undoubtedly constitutes "information or informational materials" within the meaning of Section 1702(b)(3)—a conclusion that the government does not dispute. Millions of Americans use TikTok to share "information or informational materials" with users around the world. 1JA65, 69. Indeed, the list of examples of information and informational materials in Section 1702(b)(3) includes some of the precise types of material shared on TikTok, such as "publications, films, … photographs, [and] artworks." 50 U.S.C. § 1702(b)(3). The information and informational materials that TikTok users post readily cross international borders. *See* 1JA69. "U.S. content can comprise as much as 60% of the content in TikTok's non-U.S. markets," *id.*, and U.S. users routinely import such material when they view posts created and shared by TikTok users in other countries.

25

TikTok, as a communications platform over which tens of millions of informational materials are shared every day, is akin to the "news wire feed" that is specifically included in Section 1702(b)(3) as an example of protected information and informational materials. The district court explained that, "[l]ike a news wire feed, TikTok facilitates the transmission of news but with a bonus: it also lets users publish other items on the list of informational materials, like short videos, photographs, and art," in real time as events unfold. 3JA775 (citation omitted); *see also* Oxford English Dictionary (Sept. 2003), www.oed.com/view/Entry/255044 (defining "newswire" as "a service which transmits up-to-the-minute news, usually electronically (esp. via the internet), to news media and the general public"). Thus, the Commerce Department's Prohibition constitutes a prohibition of the importation and exportation of information and informational materials by stopping new U.S. users from transmitting such materials on the app, *see* 3JA779. At a minimum, the Prohibition indirectly regulates information and informational materials in violation of Section 1702(b)(3). Indeed, the Prohibition, by banning TikTok from U.S. mobile app stores, would prohibit an average of 424,000 new U.S. users every

day from being able to share and receive information and informational materials on the platform.  1JA68.

2.  The government's attempt to cast the limitations of Section 1702(b)(3) as having narrowed the President's IEEPA authority only "in a discrete way" regarding "specific types" of communication and informational materials, Br. at 30–31, cannot be squared with the plain language of the statute.

In Section 1702(b)(3), Congress explicitly used the word "any" before "information and informational materials," demonstrating the broad reach of the limitation on regulatory authority.  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted).  Section 1702(b)(3)'s protection of information and informational materials, therefore, is "broad and, by … use of the word 'any,' [is] obviously meant to be inclusive." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972).

Congress also gave Section 1702(b) a broad scope when it specified that it does not authorize the prohibition or regulation, either "directly *or indirectly*" of information or information materials.  Thus, "Congress

27

phrased the relevant provision broadly—employing words and phrases like 'any' and 'directly *or* indirectly.'" *Ass'n of Priv. Sector Colls. v. Duncan*, 681 F.3d 427, 444 (D.C. Cir. 2012) (citations omitted) (describing the phrase "directly or indirectly" as "extremely broad language"). As courts have correctly recognized, Congress "explicitly intended, by including the words 'directly or indirectly,'" that Section 1702(b) have "broad scope." *Amirnazmi*, 645 F.3d at 585 (quoting H.R. Conf. Rep. No. 103-482, at 239 (1994)); *see also Kalantari v. NITV*, 352 F.3d 1202, 1205 (9th Cir. 2003).

The nonexclusive list of types of protected information and informational materials that Congress provided in Section 1702(b)(3) further highlights the breadth of its reach. Congress specified that the President's IEEPA authority does not include authority to prohibit or regulate information or informational materials, "including but *not limited to*, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. § 1702(b)(3) (emphasis added). Those certainly are not words of limitation.

28

3. Defendants contend that the Prohibition falls outside Section 1702(b)(3) because it is a regulation of TikTok's "commercial" transactions and "ha[s] only an *incidental* effect" on information and informational materials. Br. at 31, 35.

But Congress specified in Section 1702(b)(3) that the executive lacks the authority to regulate transactions involving information or informational materials whether those transactions are "commercial or otherwise." 50 U.S.C. § 1702(b)(3). The government's interpretation would read that clause out of the statute, contrary to fundamental canons of statutory construction. *See Kalantari*, 352 F.3d at 1207 (rejecting similar argument); *see also United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted) (court required "to give effect, if possible, to every clause and word of a statute").

The government's contention that a direct regulation of commercial transactions could not also violate Section 1702(b)(3)'s limitation against regulation of information or informational materials again conflicts with the plain language of Section 1702(b)(3), which expressly forbids the "direct[] *or indirect*[]" prohibition or regulation of information or informational materials. *See* 3JA775 (the government's argument "fails

to grapple with IEEPA's text"). A district court in another challenge to the Prohibition rejected this same government argument, because "the Government's interpretation of the informational materials exception is clearly incorrect" and "ignores Congress's deliberate insertion of the word 'indirectly' into IEEPA." *Marland v. Trump*, 2020 WL 6381397, at *9 (E.D. Pa. Oct. 30, 2020).

The government's attempt to characterize the impact of the Prohibition as having only an "incidental effect"—and not constituting indirect regulation—also has no merit. Far from having only an "incidental effect," the Commerce Department stated, and the government acknowledges, that "the objective" of the Prohibition includes "preventing" "collection, *transmission*, and segregation" of "U.S. user data," Br. at 37 (emphasis added) (quoting 2JA332). And the Commerce Department's list of collected user data that creates its targeted "vulnerability" includes informational materials such as "user-generated content, including comments, photographs, videos, and virtual item videos that [users] chose to upload or broadcast on the platform," and "information in correspondence users send to TikTok," 2JA323. Indeed, "the purpose and effect of the Secretary's prohibitions is to limit,

30

and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok." 3JA775–76.

The government's attempt, Br. at 31–34, to rely on *Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991), to carve out "incidental effects" from the statutory prohibition against indirect regulation was correctly rejected by the district court. The plaintiff in *Walsh* argued for an expansive reading of the informational materials limitation (in a similar statute, 50 U.S.C. § 4305) to protect his right to travel to Cuba to arrange for the importation of posters to the United States, including by viewing production capabilities of poster makers and negotiating face-to-face with artists, publishers, and exporters. 927 F.2d at 1231–32. This Court deferred to the Treasury Department's view that "[s]uch travel was considered too *tangential*" to the "actual physical importation and exportation of informational materials." *Id.* at 1231 (emphasis added). By contrast, "the relationship between the Secretary's prohibitions and the informational materials U.S. users post on TikTok is neither 'tangential' nor generic." 3JA776 n.1; *see also Marland*, 2020 WL 6381397, at *10 ("The effect the [Prohibitions] will have on the exchange of informational materials is in no way tangential.").

31

In any event, courts have widely recognized that governmental conduct that has an "incidental effect" nonetheless may constitute "indirect regulation." *See Oregon Waste Sys. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994) (citations omitted) (Commerce Clause limitation on states' ability "[t]o regulate Commerce" can be violated by state "regulations that have only incidental effects on interstate commerce").[4] The court in *Kalantari* explained why a reading akin to the government's here is contrary to Section 1702(b)(3). 352 F.3d at 1208–09. In *Kalantari*, a television producer acquired the rights for several imported Iranian movies and sued when a television station broadcast the movies without authorization from the producer. The district court granted summary judgment to the station, concluding that a trade embargo against Iran (and Section 1702 on which it was based) prohibited the producer from purchasing the rights that he claimed to be enforcing against the station. The Ninth Circuit reversed, however, explaining that the trade embargo

---

[4] Section 1702(b)(4), which prohibits the regulation or prohibition of "any transactions ordinarily incident to travel to or from any country," does not change this analysis. First, Section 1702(b)(4) says nothing about "incidental effects" of regulation. It uses the different phrase "ordinarily incident to" as a means to describe everyday transactions like those involving personal baggage or goods and living expenses while traveling. Second, Congress intended that Section 1702(b)(4) "prohibit restrictions *of any kind* … on travel," H.R. Conf. Rep. No. 103-482, at 239 (1994) (emphasis added), prohibiting even conduct that is "tangential" to travel.

did not undermine the producer's claimed rights in the movies because the importation of a movie was "clear[ly] … permitted" under Section 1702(b)(3). *Id.* The court explained that the commercial nature of the transaction did not remove the importation of the movies from the statute's scope. *Id.* at 1206. It further held that the "the transfer of [the] intellectual property rights" for the movies was protected under the plain language of Section 1702(b)(3), even though the agreements by which those rights were transferred "are 'ordinarily incident' to the importation and copyright of the film." *Id.* at 1209–10.[5]

Just so here: the videos, photos, art, news, and other information and informational materials shared on TikTok are indisputably protected by Section 1702(b)(3). Hence, even if the Prohibition did not directly prohibit the sharing of those materials, the Prohibition indirectly regulates it by prohibiting new U.S. users (more than 400,000 each day)

---

[5] The court of appeals also noted that the drafters of Section 1702(b)(3) "underst[ood] that it was not necessary to include any explicit reference in the statutory language to 'transactions incident' to the importation or exportation of information or informational materials, because *the conferees believe[d] that such transactions are covered by the statutory language.*" *Kalantari*, 352 F.3d at 1208 (quoting H.R. Conf. Rep. No. 103-482, at 239 (1994)).

from accessing and thus sharing information and informational materials on the app, in violation of Section 1702(b)(3).

4. The government's attempt to read an intent requirement into Section 1702(b)(3) is also without merit.

The government is wrong that Section 1702(b)(3) limits the President's authority only if regulation of informational materials is the "specific *aim* of the President's exercise of his IEEPA authority." Br. at 21. Such an intent requirement has no textual support in the statute. It also cannot be reconciled with the threshold requirement Congress imposed under IEEPA that the purpose of *any* exercise of IEEPA authority must be "to deal with" the "unusual and extraordinary threat[s]" posed to certain national interests, 50 U.S.C. § 1701(a), not to "specific[ally] aim" at regulating information or informational materials. Therefore, any such intentionally targeted regulation would not be authorized from the outset. *See* 50 U.S.C. § 1701(a).

Moreover, it is well-established that the consequence of governmental action may constitute indirect regulation, even if that regulation is not the "specific aim" of the government's conduct. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (citation omitted) ("exacting

34

scrutiny" required for speech restriction that "arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct"); *Local Union v. J.A. Jones Constr.*, 846 F.2d 1213, 1216 (9th Cir. 1988) (citation omitted) (state law indirectly regulated employee benefits in violation of ERISA, even though the purpose of the law was "to provide protection to local craftsmen"). Otherwise, the government could readily evade Section 1702(b)'s limitations by reciting an intended objective for whatever prohibition or regulation it wanted to impose that is anything other than those expressly forbidden under Section 1702(b).

Even if the purpose behind the Prohibition were relevant to the application of Section 1702(b)(3), Defendants' argument would fail because, as the district court correctly found, "the purpose and effect" of the Prohibition "is to limit, and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok." 3JA775–76 (citation omitted). Indeed, as noted above, the Commerce Department *itself* made plain that "the objective" of the Prohibition includes "preventing" "collection, *transmission*, and segregation" of "U.S. user data." Br. at 37 (emphasis added) (quoting

2JA332); *see also* 2JA323 (discussing user data collected that creates the "vulnerability" the Commerce Department is targeting).

Defendants' effort to reframe the purpose of the Prohibition ignores the other express objective of the government's actions: to stop alleged "disinformation campaigns that benefit the Chinese Communist Party." 1JA196; 2JA322–23. Combatting purported "disinformation" necessarily involves regulation of "information" or "informational materials."

Also, the government makes clear that its purported data collection concerns are inextricably bound up with the information and informational materials that are shared over TikTok. In describing the threat TikTok purportedly poses, it alleges that "TikTok 'scan[s] and analyz[es] information' associated with users' '*composing, sending, or receiving messages*' on the platform, including by collecting information on '*the content of the message.*'" Br. at 43 (emphasis added); *see also* 2JA332, 2JA323. Thus, the nature of the informational materials is directly pertinent to the purpose of the Prohibition, squarely contradicting the government's assertion that "[w]ere TikTok a weather app or a ride-share app (such as Uber or Lyft), the fundamental data-vulnerability concerns would remain." *Id.* at 37. Likewise, the

36

Commerce Department's identification as a "vulnerability" the metadata collected by the app, such as data that "track[s] videos watched," 2JA323–24, further reflects how such data is inherently a part of the informational materials.

5. The government errs in its argument that the Prohibition "do[es] not implicate the IEEPA exception for importing or exporting informational materials" because it "regulate[s] the platform (if at all) as a 'medium of transmission,' which IEEPA permits." Br. at 23.[6] The government is wrong that "Section 1702(b)(3) distinguishes 'medium[s] of transmission' from informational materials" and thereby "preserv[es] the President's authority to regulate those mediums of transmission." Br. at 48–49.

The phrase "medium of transmission" was added to Section 1702(b)(3) in 1994 to *broaden* the limitation on executive authority, and

---

[6]  Contrary to the government's suggestions, Congress did not enact 50 U.S.C. § 1702(b) as an "exception." To the contrary, Congress, when it first created IEEPA authority in 1997, specified from the outset that "[t]he authority granted to the President" by Section 1702 "does not include the authority to regulate or prohibit, directly or indirectly," personal communication, and Congress then expanded that limitation in its subsequent amendments to add "information" and "informational materials" as similarly protected. *See* Pub. L. No. 95-223, § 203(b), 91 Stat. 1627 (1977). The "exceptions" heading apparently was added when Title 50 (a non-positive law title of the Code) was codified, and is immaterial to the statute's proper construction. *See Stephan v. United States*, 319 U.S. 423, 426 (1943) (per curiam).

directly states that Section 1702(b)(3) applies "regardless of format or medium of transmission."    And the nonexclusive list of protected information and informational materials in Section 1702(b)(3) includes several types of material that could be described as mediums of transmission.    *See* 50 U.S.C. § 1702(b)(3) ("publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds").

The government's reading of Section 1702(b)(3) to allow government regulation under IEEPA of "mediums of transmission," regardless of the impact on informational materials, also is inconsistent with the statute's prohibition against the "direct[] or indirect[]" regulation of the transmission of information and informational materials.    At a minimum, the *direct* regulation of a medium of transmission may *indirectly* regulate the information shared over that medium.[7]

---

[7]    The government contends that TikTok distinguishes between its platform and the content that users share on the platform to claim immunity from liability under the Communications Decency Act as a service provider, and therefore "cannot have it both ways" by arguing here that the Prohibition "regulate[s] the import or export of 'informational materials.'" Br. at 50–51. But whether TikTok is immune

The analogy to a news wire feed—which is expressly listed as an example of information and informational materials under Section 1702(b)(3)—reinforces this conclusion. Just like a news wire feed, TikTok is "primarily a conduit of 'informational materials.'" 3JA776. "In that sense, it is (among other things) a 'medium of transmission.'" *Id.* And, just as with a news wire feed, "the transmitting medium is inextricably bound up with and exists primarily to share protected informational materials." *Id.* (footnote omitted). Thus, by closing off the medium of transmission over which information and informational materials are shared, the Prohibition, at a minimum, indirectly regulates the transmission of these materials, in violation of Section 1702(b)(3).[8]

---

under the Communications Decency Act from liability for information shared on its platform is not determinative of whether the Prohibition's regulation of that platform and its informational materials violates Section 1702(b)(3).

[8] The government argues that the district court "erred as a factual matter by conflating the concepts of a 'news wire' and a 'news wire feed.'" Br. at 55. Although the government does not provide a definition of "news wire feed," it states that a news wire is "essentially a medium of transmission, a service that transmits news." *Id.* (citation omitted). But the government elsewhere adopted a definition for "news wire feed" as a type of "telecommunications service." *See* 31 C.F.R. § 515.542(h) (OFAC regulation). In any event, the government's assertion that Congress "inten[ded] to exempt from IEEPA only the underlying *information* transmitted on the news wire as part of the feed (that is, news stories),"

6.  Defendants cite a Treasury regulation, 31 C.F.R. § 560.210(c)(1), that they contend allows prohibition of informational materials that are not fully created and in existence at the date of transaction, Br. at 53. That regulation is not legally operative in the context of the Prohibition at issue here, however, because it was adopted by a different agency (OFAC) in the context of a different exercise of IEEPA authority (the Iran sanctions program).

Even if the regulation were operative here, the district court correctly rejected the government's argument, finding that, "[w]hen users share pre-made videos, those videos are necessarily 'fully created and in existence' before they reach TikTok, which places them outside of OFAC's exclusion." 3JA777 n.2.  Defendants argue that "the district court failed to appreciate that when a user posts a video to the TikTok platform, the user generates *new* content" and therefore "do[es] not implicate the Section 1702(b)(3) exemption."   Br. at 53–54.   Under the OFAC regulation, however, the inquiry would not be whether posting a video adds "new content" to TikTok, but whether a video is "fully created and

_____

Br. at 56, cannot be squared with the statute's prohibition on direct or indirect regulation, as discussed above. *See supra* I.A.2.

40

in existence" before it is posted on the app—which indisputably many are.  3JA777 n.2.

7.  The government tries to save its atextual reading of Section 1702(b)(3) by contending that the Prohibition does not violate Section 1702(b)(3) because "[e]ven if the Secretary's prohibitions inhibit U.S. users' ability to view and share content on the TikTok app, those users could post the same short-form videos" on other platforms.  Br. at 51, 41.

Section 1702(b)(3) withholds from the President not only the authority under IEEPA to "prohibit" but also the authority to "regulate," directly or indirectly, the import or export of information and informational materials.  Thus, even if it were possible for users to migrate from TikTok to another platform and avoid an outright *prohibition* of the sharing of any particular information and informational materials—which is far from clear, given the difficulties with re-establishing a base of followers on a new app, *see Marland*, 2020 WL 6381397, at *12—the Commerce Department Prohibition would still impermissibly *regulate* the importation or exportation of that information and informational material.  In this way, Section 1702(b)(3) departs from the First Amendment principles on which the government

relies in its brief: while regulation of speech sometimes may not violate the First Amendment if adequate alternative channels of communication are available, regulation of information and informational materials is not authorized under Section 1702(b)(3) regardless of alternative channels. And, of course, here alternative channels are not adequate because the nature of information sharing is not replicated adequately on other platforms.

Even in the First Amendment context, moreover, a speech restriction may be unconstitutional, regardless of alternative channels, if it burdens more speech than is necessary, as would be the case here. *See, e.g.*, *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 880 (1997) (citation omitted) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (similar).

B.  The Prohibition Violates The Explicit Textual Limits Of Section 1702(b)(1) By, At A Minimum, Regulating Indirectly "Personal Communication."

Plaintiffs are independently likely to succeed because, based on the plain statutory text, the Prohibition violates Section 1702(b)(1)'s

specification that the President's IEEPA authority "does not include the authority to regulate or prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1).

TikTok users engage in personal communication with each other on the app millions of times every day. The app allows millions of Americans to come together to express themselves, share video content, and make connections with each other. 1JA65. It is "undisputed" that the Prohibition will prevent Americans from sharing personal communications on TikTok, as the district court correctly found. *See* 3JA778.

The government does not contest the fact that communications shared on TikTok are "personal communications," but rather argues that those personal communications "involve a transfer of [something] of value" and so are not covered by Section 1702(b)(1). As the district court found, however, "a wide swath" of the "videos, public comments …, and private messages between friends" on TikTok are personal communications "with no economic value at all." 3JA778 (citation omitted).

43

The government nonetheless maintains that this Court should reach a different conclusion because the personal communications sent over the app benefit TikTok as a platform. "[S]uch an expansive reading of the phrase 'anything of value' would write the personal-communications limitation out of the statue," however, because "[a]ll communication service providers—from televisions stations and publishers to cellular phone carriers—get some value from a user's 'presence on' their platform." 3JA778–79.

The government contends that the "district court fundamentally misunderstood the premises underlying TikTok's business" because "[w]hen a user sends a message (or takes any other action on TikTok) [the user] grants TikTok an irrevocable license to use that message (or other content)." Br. at 42. But it is the government's argument that reflects the misunderstanding.

The fact that a person sending a personal communication allows the provider of a communication service access to information, or provides a payment in exchange for use of the provider's service, does not mean that the personal communication *itself* "involve[s] a transfer of [something] of value"—whether the person provides a license to content,

a monthly payment for telephone usage, or a stamp to pay to send a letter. 50 U.S.C. § 1702(b)(1). Otherwise, any payment made to a postal, telegraph, or telephone company to send a personal communication would place that communication outside the reach of Section 1702(b)(1)—an absurd outcome that the plain language of the statute does not permit. 3JA779. Likewise, that certain users make money indirectly through their use of the app, Br. at 45, does not mean that their personal communications on the app "involve a *transfer* of [something] of value" as the statutory text provides. *See* 50 U.S.C. § 1702(b)(1) (emphasis added).

Defendants argue that because data is transferred to Plaintiffs as a byproduct of personal communications and that data is valuable, the personal communications are outside the reach of Section 1702(b)(1). Br. at 43–45. Again, this argument cannot be squared with the plain meaning of the statute—either today, or at the time it was enacted. *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quotation omitted) ("[W]ords generally should be interpreted as taking their ordinary, contemporary, common meaning … at the time Congress enacted the statute."). Section 1702(b)(1) was enacted in 1977, when the internet did not exist. At that time, personal communications occurred

45

face-to-face, or through the mail, a telegraph, or over the telephone. Particularly in that historical context, the plain meaning of the words "transfer of anything of value" certainly does not allow regulation of a personal communication just because metadata related to the communication might be monetized. Instead, Section 1702(b)(1) meant what it means today: the transfer of money as part of a personal communication. *See* H.R. Conf. Rep. No. 95-459, at 15 (1977) ("The authority of title II [IEEPA] does not extend to the interruption or hindrance, direct or indirect, of private communications, which are not *commercial or financial transactions*.") (emphasis added).

Defendants' interpretation of "anything of value" would permit the executive to regulate under IEEPA virtually *all* personal communications that do not take place face-to-face, leaving Section 1702(b)(1) with no meaningful force. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989) (citation omitted) ("[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it

unreasonable to believe that the legislator intended to include the particular act.").[9]

C.  The Government's Reading Of Sections 1702(b)(3) And (b)(1) Would Raise Serious Constitutional Questions That Should Be Avoided.

The question before this Court is one of statutory interpretation, and IEEPA, like any statute, should not be interpreted in a manner that raises constitutional concerns if there is another plausible interpretation. *See Clark v. Martinez*, 543 U.S. 371, 380 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice."). If one construction "would raise a multitude of constitutional problems, the other should prevail." *Id.* at 380–81. Thus, even if Sections 1702(b)(3) and (b)(1) were susceptible to the government's interpretation, any ambiguity would need to be resolved in favor of the district court's reading that preserves the statute's constitutionality.

Defendants' interpretation of Sections 1702(b)(3) and (b)(1) raises a host of First Amendment concerns, as Plaintiffs' briefing in the district

---

[9]  For the same reasons, the district court correctly rejected the government's arguments under Section 1702(b)(1) similar to those it raised under Section 1702(b)(3).

court makes clear.  *See* Br. of Plaintiffs-Appellees at 27–30, *TikTok v. Trump*, No. 20-cv-2658 (D.D.C. Sept. 27, 2020) (explaining that the Prohibitions prevent a communications platform, whose operations are by definition intimately related to speech, from providing communications services to users, and impose a disproportionate burden on speakers, including Plaintiffs, in violation of the First Amendment); *see also U.S. WeChat Users v. Trump*, 2020 WL 5592848, at *10 (N.D. Cal. Sept. 19, 2020) (holding that similar prohibitions targeting WeChat, an app owned by a Chinese company, likely violate the First Amendment); *U.S. WeChat Users v. Trump*, 2020 WL 6271054, at *7 (N.D. Cal. Oct. 23, 2020) (similar).[10]

Therefore, the Court should avoid the government's interpretation under the constitutional doubt doctrine.  *See Gomez v. United States*, 490 U.S. 858, 864 (1989); *Hooper v. People*, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality.").

---

[10]  The district court has not ruled on Plaintiffs' First Amendment argument, but noted that "Plaintiffs appear to have presented at least serious questions on their other claims."  3JA779 n.3.

D.    The Government's Reading Of Sections 1702(b)(3) And (b)(1) Cannot Be Reconciled With The Statutory Structure.

The government's interpretation of Sections 1702(b)(3) and (b)(1) cannot be reconciled with the structure of IEEPA or other statutory provisions invoked by the government.

1.    Another limitation on regulatory authority that Congress set forth in Section 1702(b)(2), right between Sections 1702(b)(1) and (b)(3), further highlights the incorrectness of the government's interpretation of (b)(1) and (b)(3).  Section 1702(b)(2) provides that "[t]he authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly … donations … of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering." 50 U.S.C. § 1702(b)(2).  Congress included in Section 1702(b)(2) three explicit exceptions: "except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement

49

in hostilities is clearly indicated by the circumstances." 50 U.S.C. § 1702(b)(2).

Congress included no such exceptions in Sections 1702(b)(1) or (b)(3). The government's interpretation would nonetheless read an exception akin to Section 1702(b)(2)'s exception (A) into Sections 1702(b)(1) and (b)(3), despite Congress's express failure to enact one. The government's reading would allow the limitations of Sections 1702(b)(3) and (b)(1) to be overridden, in essence, by the (b)(2)(A) exception if the limitation would seriously impair the President's "ability to deal with any national emergency declared under section 1701." *Id.* That would be in direct contradiction of the statutory framework created by Congress. *See D.C. Hosp. Ass'n. v. District of Columbia*, 224 F.3d 776, 780 (D.C. Cir. 2000) (inclusion of language in one section of a statute and not another is "compelling evidence" of congressional intent). Moreover, Section 1702(b)(3) itself specifies that it does not include certain controlled exports or acts prohibited by certain other statutes (*e.g.*, dissemination of classified information), which further demonstrates that Congress did not impliedly include in Section 1702(b)(3) the exception that it set forth in Section 1702(b)(2). *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)

50

(citation omitted) (cautioning against finding implied exceptions, particularly "[w]here Congress explicitly enumerates certain exceptions").

2.  The government invokes 50 U.S.C. § 1708 and contends that it somehow indicates that Congress did not intend Section 1702(b)(3) to protect the sharing of information and informational materials over a communications platform like TikTok.  Br. at 52.  But Section 1708 suggests no such thing.[11]

Section 1708 addresses the President's authority to sanction cybercriminals who engage in theft of trade secrets or proprietary information through deployment of malicious computer code or the like, not the sharing of information or informational materials protected by Section 1702(b)(3).  And it is limited to authorizing the blocking or prohibition of transactions involving certain property of foreign persons whom the President determines "knowingly" are involved in "the

---

[11]  Section 1708 of Title 50 was not enacted as an amendment to IEEPA as the government suggests, Br. at 52, but rather as Section 1637 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 1637, 128 Stat. 3292, 3644–3647 (2014), and then codified at Section 1708 of Title 50.

significant appropriation, through economic or industrial espionage in cyberspace, of technologies or proprietary information developed by United States persons." 50 U.S.C. §§ 1708(b)(1), (b)(2).

Section 1708 does not provide any basis for giving an atextual reading to Sections 1702(b)(3) and (b)(1). Indeed, Section 1708(c) specifies that "[n]othing in this section shall be construed to affect the application of any penalty or the exercise of any authority provided for under any other provision of law." 50 U.S.C. § 1708(c); *see Hedges v. Obama*, 724 F.3d 170, 191 (2d Cir. 2013) (similar provision "expressly disclaims any statement about existing authority"); *Marland*, 2020 WL 6381397, at *10 n.7 (rejecting similar argument).

E.  The Government's Interpretation Of Sections 1702(b)(3) And (b)(1) Is Belied By The Statutory Background and Purpose.

1.  The government acknowledges that Congress enacted the Section 1702(b)(3) limitation on regulation of information materials in 1988 "on 'the principle that no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment.'" Br. at 6–7 (quotation omitted). When Congress enacted the Section 1702(b)(1) limitation on regulation of personal communication a decade earlier, in 1977, it designed the statute "both to

preserve First Amendment freedoms of expression," and also to preclude policies that would "isolate the people of the United States" from people of other nations.  H.R. Conf. Rep. No. 95-459, at 15 (1977).

Indeed, the 1988 enactment of the informational materials limitation was in response to several seizures of shipments of magazines and books from embargoed countries at the U.S. border under the authority of IEEPA.  And Congress amended Section 1702(b)(3) expressly to expand IEEPA's prohibition against executive regulation of informational materials.  *Kalantari*, 352 F.3d at 1205 (citations omitted); *see* Pub. L. No. 100-418, § 2502(b)(1), 102 Stat. 1371 (1988).  The amendment confirmed Congress's manifest intent that "no prohibitions should exist on imports to [or exports from] the United States of ideas and information if their circulation is protected by the First Amendment."  H.R. Rep. No. 100-40, pt. 3, at 113 (1987); *see also Kalantari*, 352 F.3d at 1205 (citation omitted) (similar); *Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989) (similar).

In 1994, Congress again expressly broadened the limitation on IEEPA regulatory authority by amending Section 1702(b)(3) to "restrict the Executive from regulating transactions concerning informational

53

materials 'regardless of format or medium of transmission.'" *Amirnazmi*, 645 F.3d at 585 (citation omitted). The amendment responded to Treasury regulations promulgated in the wake of the 1988 Amendment that excluded from the definition of "informational materials," among other things, "intangible items, such as telecommunications transmissions." *See* 54 Fed. Reg. 5229 (Feb. 2, 1989) (codified at 31 C.F.R. §§ 500.206, 500.332); *Amirnazmi*, 645 F.3d at 584–85. That overly restrictive view of "informational materials" in Section 1702(b)(3) prompted the amendment to address the "restrictive interpretations." H.R. Conf. Rep. No. 103-482, at 238–39 (1994). The amendment was aimed at "protect[ing] the constitutional rights of Americans to educate themselves about the world by communicating with peoples of other countries in a variety of ways, such as by sharing information and ideas with persons around the world … and engaging in educational, cultural and other exchanges with persons from around the world." H.R. Conf. Rep. No. 103-482, at 238 (1994); *see also Kalantari*, 352 F.3d at 1206.

Congress's 1994 amendment explicitly broadened the text in Section 1702(b)(3) in at least four ways: (1) it expanded the limitation to apply to "any information" in addition to informational materials; (2) it

specified that the limitation applies "regardless of format or medium of transmission"; (3) it added a list of technologies ("compact disks, CD ROMS, artworks, and news wire feeds") to illustrate the breadth of the "information or informational materials" referenced; and (4) it specified that the list of informational materials is not exhaustive but identifies only some of the materials "includ[ed]" in the term. 50 U.S.C. § 1702(b)(3).

The government disregards the significance of the statutory background and purpose, but the upshot is clear: Congress amended the statute *twice* to limit presidential regulatory authority in response to the executive branch's overly-restrictive interpretations of the statute. The executive branch's effort in this case to urge, yet again, an overly narrow, atextual construction of Section 1702(b), with no apparent limit, runs directly contrary to this unusually clear statutory backdrop.

2. At one point in its brief, the government cites the generally broad authority under IEEPA, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–37 (1952) (Jackson, J., concurring), and Congress's ability to vest the executive with broad power in national security affairs. *See* Br. at 26–29. But the executive is not acting in this case pursuant to an

55

"express authorization" from Congress.  To the contrary, the Prohibition conflicts directly with the express limitation on authority contained in Section 1702(b).  "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

The government's discussion of *Youngstown* deflects attention from the explicit statutory limitations on the executive's regulatory authority under IEEPA that were enacted by Congress and that govern this case. Indeed, the breadth of the executive's IEEPA powers merely underscores the need for close judicial scrutiny of a claim to power broader than the statutory limitations.  *Cf. id.* at 637–38 ("Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution[.]").

Defendants' assertion that the Court should adopt their flawed interpretation of Section 1702(b) because "Congress has historically delegated substantial discretion to the President in the fields of national security and foreign affairs," Br. at 27, mischaracterizes the issue before the Court.  This is not a case in which the Court is asked to second-guess a national security determination.  The question before the Court is the proper construction of a statute, which is a question squarely in the

56

Court's authority and responsibility to resolve. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012). The executive is not entitled to any particular deference on a "pure question of statutory construction" in the domain of national security and foreign affairs. *See Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004).

3. The government's contention that the district court's interpretation of Section 1702(b) would create an "IEEPA-free zone" is unpersuasive. IEEPA affirmatively grants the government authority, subject to statutory limitations, to:

> regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B).

That provision authorizes the President to regulate transactions involving information technology companies (by any person, or with respect to any property, subject to U.S. jurisdiction), so long as the exercise of that authority does not violate the limitations set forth in Section 1702(b). That leaves ample room for regulation where it is

warranted.   For example, the President has authority to prohibit or regulate digitally-encoded malware, which lacks expressive content or humanly interpreted information and is markedly different in kind from the films, photographs, artworks, and news wire feeds enumerated in Section 1702(b)(3) and shared on TikTok.  But what the President cannot do is use IEEPA authority to target speech itself, as here, preventing hundreds of millions of Americans from accessing TikTok as a means of silencing personal communications and informational material sharing on that app.  *See supra* I.A.4.[12]  *See also Marland*, 2020 WL 6381397, at *12 (rejecting similar argument).

---

[12]  To the extent the President seeks to regulate information supply chains in a manner prevented under Section 1702(b), he has alternative means at his disposal.  For example, neither CFIUS's authority to review transactions for national security concerns, nor the Federal Communication Commission's Section 214 licensing authority (which requires carriers with market power in a foreign country to obtain U.S. government approval to provide an international telecommunications service in the United States) limits regulatory authority over personal communication or information and informational materials.  *See, e.g.*, 50 U.S.C. § 4565; 47 U.S.C. § 214.

58

## II.   The Other Relevant Factors Support The Preliminary Injunction.

### A.   Absent A Preliminary Injunction, Plaintiffs Would Suffer Irreparable Harm.

The district court correctly found that, without a preliminary injunction, the Prohibition at issue here—the app store ban—"will inflict irreparable economic and reputational harm on Plaintiffs." 3JA781. By barring new users from accessing the app and preventing 100 million existing users from downloading essential updates, the enjoined Prohibition would devastate Plaintiffs' user base and competitive position, destroying the goodwill necessary for them to maintain their commercial partnerships, and crippling their ability to attract and retain talent. "This factor therefore weighs in favor of granting preliminary relief." *Id.*

It is "undisputed" that before issuance of the Commerce Department Prohibitions, "TikTok was one of the fastest growing apps in the United States, adding 424,000 new users each day." 3JA780. "New users are the lifeblood of a social media application like TikTok," 1JA68, and by preventing new U.S. users from downloading TikTok, the Prohibition would deprive Plaintiffs of this daily influx of new users that serves as the "economic foundation[]" of their business. 1JA67. The

59

government's argument that Plaintiffs "failed to present any evidence to establish with certainty" how prospective new users would react to the app store ban, Br. at 56, is contradicted by the *undisputed* fact that the ban would immediately bring the number of average daily new U.S. TikTok users from 424,000 to zero. 3JA780. Depriving a fast-growing communications platform of all new U.S. members "threatens the very existence of the movant's business," causing irreparable harm. *Wisconsin Gas Co.* v. *FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Because the app store ban would "immediately foreclos[e] the hundreds of millions of Americans who have not yet downloaded the app from joining the TikTok community," 1JA68, individuals who would have joined the TikTok community would instead turn to alternative platforms, 1JA69. This attrition of users to competitor platforms would damage TikTok's market share and competitive position. Such harms are far from "speculat[ive]," as the government asserts, Br. at 58–59; rather, they are supported by data of the behavior of both past and present TikTok users. For example, TikTok's experience during the two-week India ban in 2019 demonstrated "that users and content creators will shift to less attractive and less functional substitutes if TikTok

60

becomes unavailable to new users." 1JA68. Indeed, even *rumors* of TikTok's future unavailability in the wake of the August 6 order and the threat of the Prohibitions drove users and highly-visible content creators to competitor platforms. 1JA70. And because "[t]he nature of social media is … such that users are unlikely to return to platforms that they have abandoned," TikTok would not be able to recover the loss of users even if the Prohibition were later lifted. 3JA780.

Halting the growth of TikTok's user base and stopping existing users from downloading updates would irreparably damage Plaintiffs' market position and reputation, and in turn would deplete revenue the company derives from advertising and commercial partnerships. 1JA70. TikTok's fast-growing and vibrant community has been its hallmark, and without new daily users, TikTok would become a less attractive commercial partner. *See id.*; 3JA781. If the growing TikTok community becomes stagnant, advertisers and commercial partners—much like would-be users—would move away from TikTok and toward other communications platforms that have the ability to add new U.S. users.

In addition to causing a substantial loss in revenue, this loss of commercial partnerships would irreversibly damage Plaintiffs'

reputation and business goodwill. *See* 1JA70. This harm to TikTok's reputation, the uncertainty about TikTok's future generated by the app store ban, and the real harms caused to existing users by the Prohibition—including their inability to download updates (including security updates) to the app—would also hamper Plaintiffs' ability to recruit and retain top talent to maintain and expand their business. *See* 3JA781; 1JA71–72. Plaintiffs could never recoup these tangible and intangible losses, each of which independently suffices to establish irreparable harm.

Defendants' argument that Plaintiffs failed to conclusively establish that the Prohibition would cause these harms is further undermined by the district court's adoption of Plaintiffs' key factual allegations, which were supported by unrebutted evidence. *See* 3JA780–81. In particular, the district court found that:

- "Barring TikTok from U.S. app stores would, of course, have the immediate and direct effect of halting the influx of new users."

- "[U]ncertainty in TikTok's future availability has already driven, and will continue to drive, content creators and fans to other platforms."

- "If the first prohibition were to take effect tonight but was later held to be unlawful, TikTok would not be able to recover the harm to its user base," because "[t]he nature of social media is … such that

62

users are unlikely to return to platforms that they have abandoned."

- "In the absence of injunctive relief, [TikTok] will be unable to recruit and retain employees to build—or even maintain—its business."

3JA780–81 (citations omitted). Each of these underlying factual findings is reversible only if clearly erroneous, which Defendants certainly have not established. *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019).

Defendants further argue that "plaintiffs failed to demonstrate" that the economic harms that they will suffer from the Prohibition "amounts to irreparable injury." Br. at 59. Although economic loss alone generally does not constitute irreparable harm, that is not so when the harm—as here—"is so severe as to cause extreme hardship to the business or threaten its very existence." *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

Moreover, when sovereign immunity bars a plaintiff from recovering damages from a federal agency—as is the case here— economic loss suffered by the plaintiff may be irreparable. *See Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008). As this

63

Court has explained, "the general rule … that economic harm does not constitute an irreparable injury … is based upon the presumption that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Robertson v. Cartinhour*, 429 F. App'x 1, 3 (D.C. Cir. 2011) (per curiam) (quotation and citation omitted). "That presumption does not hold and the general rule does not apply where, as here," such relief is unavailable. *Id.*

  B. <u>The District Court Appropriately Balanced The Equities And Public Interest.</u>

The district court correctly concluded that Plaintiffs have established that the final two considerations for provisional relief weigh in their favor—the balance of equities and the public interest—which merge when the government is a party. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). In assessing these factors, courts consider the impact of the injunction on nonparties as well. *See id.* at 511–12.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (collecting cases). "To the contrary, there is a substantial public interest in having governmental agencies abide by

the federal laws that govern their existence and operations." *Id.* Here,

Plaintiffs have demonstrated that they are likely to succeed on their

claims that the government action is unlawful, "and the government

'cannot suffer harm from an injunction that merely ends an unlawful

practice or reads a statute as required.'" 3JA782 (quoting *R.I.L-R v.*

*Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

Likewise, the public interest requires an injunction against the

Prohibition's restriction of millions of Americans' ability to download the

TikTok app and engage in protected speech and communications, in

violation of their First Amendment rights, and TikTok's right to

communicate with new U.S. users. *Pursuing Am.'s Greatness*, 831 F.3d

at 511 ("there is always a strong public interest in the exercise of free

speech rights"); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)

(similar). Moreover, if the injunction is vacated, more than 100 million

Americans who *already* use the app will be unable to download updates

(including security updates). The inability to obtain these security

updates would increase data security risks to those individuals,

undermining the very reason the Prohibitions were purportedly issued.

The government contends that the district court improperly "collaps[ed]" its public interest analysis into "its evaluation of plaintiffs' likelihood of success on the merits." Br. at 60. Not so. This Court has recognized that the likelihood of success weighs heavily in the evaluation of the public interest when government action is challenged because of the "substantial public interest" in agencies "abid[ing] by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (quotation omitted). The court was therefore correct to consider Plaintiffs' likelihood of success on the merits in its balancing of the equities and public interest: Where it is clear that the challenged executive action is unlawful, the public interest favors the challenger of the unlawful action.

On the other side of the ledger, the government does not suffer harm from the preliminary injunction because it "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R*, 80 F. Supp. 3d at 191 (quotation omitted).

The government has not demonstrated that the Prohibition is necessary to advance its purported national security interest— particularly where preventing existing users from downloading security

66

updates will undermine the very data security efforts the government claimed the Prohibition was required to address. But even if it had, the government has not made a credible showing that *immediate* implementation of the Prohibition is necessary. 3JA782. The timeline of the government's actions—the Commerce Department's 43-day delay in issuing the Prohibition after the President identified the purported national security threat, the additional one-week delay in implementing it, and the further seven-week delay in fully implementing the remaining Prohibitions—demonstrate that there is not an urgent need to enforce the enjoined Prohibition immediately. And the government has recognized that there are measures, short of a ban, that could address its purported concerns. *See, e.g.*, 1JA247 (proposed regulations allowing for mitigation solution); 1JA302 (same for Executive Order).

The government's rote invocation of deference to the executive regarding "national security interests" does not change this conclusion. *See United States v. Robel*, 389 U.S. 258, 264 (1967) ("'national defense' cannot be deemed an end in itself"). Although national security is indisputably a compelling government interest, this does not mean it always tips the balance of equities in favor of the government, as even

the cases the government cites make clear.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

## CONCLUSION

For the reasons set forth above, the preliminary injunction entered on September 27, 2020 should be affirmed.

DATED: November 6, 2020               Respectfully submitted,

                                      */s/ Beth S. Brinkmann*

John E. Hall                          Beth S. Brinkmann (No. 477771)
Anders Linderot                       Alexander A. Berengaut
COVINGTON & BURLING LLP               Megan A. Crowley
The New York Times Building           Megan C. Keenan
620 Eighth Avenue                     COVINGTON & BURLING LLP
New York, New York 10018              One CityCenter
Telephone: +1 (212) 841-1000          850 Tenth Street, NW
Facsimile: + 1 (212) 841-1010         Washington, DC 20001
Email:  jhall@cov.com                 Telephone: +1 (202) 662-6000
        alinderot@cov.com             Facsimile: + 1 (202) 778-6000
                                      Email:  bbrinkmann@cov.com
                                              aberengaut@cov.com
                                              mcrowley@cov.com
                                              mkeenan@cov.com

                                      *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains 12,969 words.

2.      This brief complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.

32(a)(6) because the brief has been prepared in a proportionally spaced

typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

*/s/ Beth S. Brinkmann*
Beth S. Brinkmann

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Beth S. Brinkmann*
Beth S. Brinkmann

**ADDENDUM**

# Table of Contents

50 U.S.C. § 1701...........................................................................A-1

50 U.S.C. § 1702...........................................................................A-2

50 U.S.C. § 1708...........................................................................A-6

Pub. L. No. 95-223, title II, § 203(b), 91 Stat. 1626 (1977) .................A-10

Pub. L. No. 100-418, title II, § 2502(b)(1), 102 Stat. 1371 (1988).......A-11

Pub. L. No. 103-236, title V, § 525(c)(1), 108 Stat. 474 (1994)............A-12

Pub. L. No. 113-291, title XVI, §§ 1637(b)–(c), 128 Stat. 3292
    (2014) .....................................................................................A-13

31 C.F.R. § 515.542(h) ...............................................................A-15

31 C.F.R. § 560.210(c)................................................................A-16

**50 U.S.C. § 1701**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities**

**(a)** Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

**(b)** The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

50 U.S.C. § 1702

## § 1702. Presidential authorities

**(a) In general**

**(1)** At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

**(A)** investigate, regulate, or prohibit—

**(i)** any transactions in foreign exchange,

**(ii)** transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

**(iii)** the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States;

**(B)** investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

**(C)** when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the

A-2

United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

**(2)** In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

**(3)** Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

## (b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

A-3

**(1)** any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

**(2)** donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

**(3)** the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 4605 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

**(4)** any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

## (c) Classified information

In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section

1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

**50 U.S.C. § 1708**

**§ 1708. Actions to address economic or industrial espionage in cyberspace**

**(a) Report required**

> **(1) In general**
> Not later than 180 days after December 19, 2014, and annually thereafter through 2020, the President shall submit to the appropriate congressional committees a report on foreign economic and industrial espionage in cyberspace during the 12-month period preceding the submission of the report that—

>> **(A)** identifies—

>>> **(i)** foreign countries that engage in economic or industrial espionage in cyberspace with respect to trade secrets or proprietary information owned by United States persons;

>>> **(ii)** foreign countries identified under clause (i) that the President determines engage in the most egregious economic or industrial espionage in cyberspace with respect to such trade secrets or proprietary information (to be known as "priority foreign countries");

>>> **(iii)** categories of technologies or proprietary information developed by United States persons that—

>>>> **(I)** are targeted for economic or industrial espionage in cyberspace; and

>>>> **(II)** to the extent practicable, have been appropriated through such espionage;

**(iv)** articles manufactured or otherwise produced using technologies or proprietary information described in clause (iii)(II); and

**(v)** to the extent practicable, services provided using such technologies or proprietary information;

**(B)** describes the economic or industrial espionage engaged in by the foreign countries identified under clauses (i) and (ii) of subparagraph (A); and

**(C)** describes—

**(i)** actions taken by the President to decrease the prevalence of economic or industrial espionage in cyberspace; and

**(ii)** the progress made in decreasing the prevalence of such espionage.

**(2) Determination of foreign countries engaging in economic or industrial espionage in cyberspace**
For purposes of clauses (i) and (ii) of paragraph (1)(A), the President shall identify a foreign country as a foreign country that engages in economic or industrial espionage in cyberspace with respect to trade secrets or proprietary information owned by United States persons if the government of the foreign country—

**(A)** engages in economic or industrial espionage in cyberspace with respect to trade secrets or proprietary information owned by United States persons; or

**(B)** facilitates, supports, fails to prosecute, or otherwise permits such espionage by—

**(i)** individuals who are citizens or residents of the foreign country; or

A-7

**(ii)** entities that are organized under the laws of the foreign country or are otherwise subject to the jurisdiction of the government of the foreign country.

**(3) Form of report**
Each report required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

## (b) Imposition of sanctions

**(1) In general**
The President may, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of each person described in paragraph (2), if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

**(2) Persons described**
A person described in this paragraph is a foreign person the President determines knowingly requests, engages in, supports, facilitates, or benefits from the significant appropriation, through economic or industrial espionage in cyberspace, of technologies or proprietary information developed by United States persons.

**(3) Exception**
The authority to impose sanctions under paragraph (1) shall not include the authority to impose sanctions on the importation of goods.

**(4) Implementation; penalties**

**(A) Implementation**
The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this subsection.

A-8

**(B) Penalties**

The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to a person that violates, attempts to violate, or conspires to violate, or causes a violation of, this subsection or a regulation prescribed under this subsection to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act.

**(c) Rule of construction**

Nothing in this section shall be construed to affect the application of any penalty or the exercise of any authority provided for under any other provision of law.

**Pub. L. No. 95-223, title II, § 203(b), 91 Stat. 1626 (1977)**

**PUBLIC LAW 95-223—DEC. 28, 1977**

. . . .

**Grant of Authorities**
**Sec. 203.**

. . . .

**(b)** The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

> **(1)** any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value; or

> **(2)** donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 202 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.

**Pub. L. No. 100-418, title II, § 2502(b)(1), 102 Stat. 1371 (1988)**

**PUBLIC LAW 100-418-AUG. 23, 1988**

. . . .

**SEC. 2502. LIMITATION ON EXERCISE OF EMERGENCY AUTHORITIES.**

. . . .

**(b) International Emergency Economic Powers Act.—**

**(1)** Section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)) is amended—

**(A)** in paragraph (1) by striking "or" after the semicolon;

**(B)** in paragraph (2) by striking the period and inserting "; or"; and

**(C)** by adding at the end the following
"(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials, which are not otherwise controlled for export under section 5 of the Export Administration Act of 1979 or with respect to which no acts are prohibited by chapter 37 of title 18, United States Code.".

A-11

**Pub. L. No. 103-236, title V, § 525(c)(1), 108 Stat. 474 (1994)**

**PUBLIC LAW 103-236—APR. 30, 1994**

. . . .

**SEC. 525. FREE TRADE IN IDEAS.**

. . . .

**(c) Amendments to International Emergency Economic Powers Act.—**

**(1)** Section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b)) is amended by striking paragraph (3) and inserting the following new paragraphs:

"(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 5 of the Export Administration Act of 1979, or under section 6 of such Act to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of title 18, United States Code; or

"(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country, including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.".

A-12

**Pub. L. No. 113-291, title XVI, §§ 1637(b)–(c), 128 Stat. 3292 (2014)**

**PUBLIC LAW 113–291—DEC. 19, 2014**

**CARL LEVIN AND HOWARD P. "BUCK" MCKEON NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2015**

. . . .

**SEC. 1637. ACTIONS TO ADDRESS ECONOMIC OR INDUSTRIAL ESPIONAGE IN CYBERSPACE.**

. . . .

**(b) Imposition of Sanctions.—**

**(1)** IN GENERAL.—The President may, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of each person described in paragraph (2), if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

**(2)** PERSONS DESCRIBED.—A person described in this paragraph is a foreign person the President determines knowingly requests, engages in, supports, facilitates, or benefits from the significant appropriation, through economic or industrial espionage in cyberspace, of technologies or proprietary information developed by United States persons.

**(3)** EXCEPTION.—The authority to impose sanctions under paragraph (1) shall not include the authority to impose sanctions on the importation of goods.

**(4)** IMPLEMENTATION; PENALTIES.—

**(A)** IMPLEMENTATION.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act (50 U.S.C. 1702 and 1704) to carry out this subsection.

**(B)** PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) shall apply to a person that violates, attempts to violate, or conspires to violate, or causes a violation of, this subsection or a regulation prescribed under this subsection to the same extent that such penalties apply to a person that commits an unlawful act described in section 206(a) of that Act.

**(c) RULE OF CONSTRUCTION.**—Nothing in this section shall be construed to affect the application of any penalty or the exercise of any authority provided for under any other provision of law.

. . . .

**31 C.F.R. § 515.542(h)**

**§ 515.542 Mail and telecommunications-related transactions.**

. . . .

**(h)** For purposes of this section, the term "telecommunications services" includes data, telephone, telegraph, internet connectivity, radio, television, news wire feeds, and similar services, regardless of the medium of transmission, including transmissions by satellite.

. . . .

**31 C.F.R. § 560.210(c)**

**§ 560.210 Exempt transactions.**

. . . .

**(c) Information or informational materials.**

> **(1)** The prohibitions contained in this part do not apply to the importation from any country and the exportation to any country of information or informational materials, as defined in § 560.315, whether commercial or otherwise, regardless of format or medium of transmission.

> **(2)** This section does not exempt from regulation or authorize transactions related to information or informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services. Such prohibited transactions include, but are not limited to, payment of advances for information or informational materials not yet created and completed (with the exception of prepaid subscriptions for widely circulated magazines and other periodical publications); provision of services to market, produce or co-produce, create, or assist in the creation of information or informational materials; and payment of royalties with respect to income received for enhancements or alterations made by U.S. persons to such information or informational materials.

> **(3)** This section does not exempt or authorize transactions incident to the exportation of software subject to the Export Administration Regulations, 15 CFR parts 730 through 774, or to the exportation of goods (including software) or technology for use in the transmission of any data, or to the provision, sale, or leasing of capacity on telecommunications transmission facilities (such as satellite or terrestrial network connectivity) for use in the transmission of any data. The exportation of such items or services

A-16

and the provision, sale, or leasing of such capacity or facilities to Iran, the Government of Iran, an Iranian financial institution, or any other person whose property and interests in property are blocked pursuant to § 560.211 are prohibited.

. . . .